Case Numbers:  21-55118; 21-55157

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

_____

CHRISTOPHER GARNIER, KIMBERLY GARNIER,

Plaintiffs-Appellees

v.

MICHELLE O'CONNOR-RATCLIFF, T.J. ZANE,

Defendants-Appellants.

_____

## APPELLANTS' FIRST BRIEF ON CROSS-APPEAL

_____

Appeal from Judgment and Post-Judgment Orders
Honorable Roger T. Benitez
United States District Court – Southern Division
Case No: 3:17-cv-02215-W-JLB

_____

ARTIANO SHINOFF
Jack M. Sleeth Jr., Esq. (SBN 108638)
Paul V. Carelli, IV, Esq. (SBN 190773)
3636 Fourth Avenue, Suite 200
San Diego, CA 92103
Telephone:  (619) 232-3122
Attorneys for Appellants
Michelle O'Connor-Ratcliff, T.J. Zane

# TABLE OF CONTENTS

**PAGE**

I. INTRODUCTION ...................................................................................7

II. ISSUES ON APPEAL.............................................................................8

III. JURISDICTIONAL STATEMENT ......................................................9

  A. The District Court's Jurisdiction............................................................9

  B. The Ninth Circuit's Jurisdiction............................................................9

IV. FACTUAL BACKGROUND.................................................................9

  A. Parties and Pages ................................................................................10

  B. PUSD Board Meetings in the Physical World ...................................11

  C. Other Alternate Avenues of Communcation.......................................12

  D. Plaintiffs' Interactions with Defendants' Pages and Accounts .........13

  E. Use of Word Filters .............................................................................13

  F. Blocking................................................................................................14

  G. Rationale for Blocking was Due to Plaintiffs' Spamming .................15

V. PROCEDURAL BACKGROUND.......................................................16

  A. The Complaint Alleged Claims for Violations of the First Amendment by O'Connor-Ratcliff, Zane and the District ...........................................16

  B. Defendants Filed a Motion for Summary Judgment that Was Granted in Part and Denied in Part ........................................................................16

  C. The Court Issued Judgment, and Defendants Timely Appealed...................17

  D. The Court Clerk ordered Defendants to pay costs and denied Plaintiff's Motion for fees. .........................................................................................17

VI. SUMMARY OF ARGUMENTS.................................................................17

VII. ARGUMENTS .......................................................................................19

  A. The Court Erred in Determining Defendants' Blocking Social Media Sites Constituted State Action ...................................................................19

    1. A Section 1983 Action Requires "State Action".........................................19

    2. Defendants Offered Three Reasons the Sites Were Private. .....................21

     a. The Sites Were Personal Campaign Sites .................................................21

     b. A Legislator Has Different Authority than and Executive ......................22

# TABLE OF CONTENTS CONTINUED

**PAGE**

    c.   The School District Did Not Support the Sites........................................23

    3. Case Law Does Not Support the Finding of "State Action".......................23

B.  The Court Erred in Finding Defendants' Blocking of Social Media Was No Longer Narrowly Tailored .................................................................................31

    1.  The Blocking Was a Properly Tailored "Time, Place, or Manner" Restriction. .............................................................................................................31

     a.  Defendants' Blocking Was a Content- Neutral Rule of Decorum...........32

    2.  The Held Defendants' Blocking of Plaintiffs Was Initially Narrowly Tailored. ..............................................................................................................31

     3.  The Court Erred in Determining the Blocking Was No Longer Narrowly Tailored ..........................................................................................................36

   C.  Defendants Use of Word Filters Closed the Public Forum............................38

   D. ..........Defendants Are Entitled To Qualified Immunity And Plaintiffs Are Not Entitled To Recover Damages Including Costs And Fees......................................39

    1.  Appealability of the Orders on Costs and Fees..........................................31

    2.  Defendants Are Immune From Costs. ......................................................40

VIII.     CONCLUSION ..................................................................................42

CERTIFICATE OF WORD COUNT ....................................................................44

CERTIFICATE OF SERVICE ..............................................................................45

# TABLE OF AUTHORITIES

**PAGE**

## CASES

*Biden v. Knight First Amendment Institute At Columbia University*
(2021) 141 S.Ct. 1220].................................................................. 21, 23

*Brentwood Academy v. Tennessee Secondary School Athletic Ass'n,*
531 U.S. 288 (2001)..................................................................... 26, 27

*C.F. ex rel. Farnan v. Capistrano Unified School Dist.*
(9th Cir. 2011) 654 F.3d 975 ................................................. 38, 39, 41

*Campbell v. Reisch,*
367 F.Supp.3d 987, (W.D. Mo. 2019) ..............................................25

*Civil Rights Cases,*
09 U.S. 3, 17 (1883)........................................................................18

*Cohen v. Beneficial Indus. Loan Corp.,*
337 U.S. 541 , 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).........................37

*Cox v. New Hampshire,*
312 U.S. 569 (1941)........................................................................29

*D'Aguanno v. Gallagher*
(11th Cir. 1995) 50 F.3d 877 ..........................................................39

*Davison v. Loudon County Board of Supervisors,*
267 F.Supp.3d 702 (E.D. VA 2017) ........................................... 24, 27

*DiLoreto v. Unified Sch. Dist. Bd. Of Educ.,*
196 F.3d 958 (9th Cir. 1999) ..........................................................36

*Farnan v. Capistrano Unified School Dist.*
(9th Cir. 2011) 654 F.3d 975 ..........................................................38

# TABLE OF AUTHORITIES CONTINUED

**PAGE**

**CASES**

*German v. Eudaly*,
  No. 3:17-CV-2028-MO, 2018 WL 3212020 (D. Or. June 29, 2018) ................22

*Golden Gateway Center v. Golden Gateway Tenants Assn.*,
  26 Cal.4th 1013 (Cal. 2001) ..................................................................................18

*Hudgens v. N. L. R. B.*,
  424 U.S. 507 (1976) ..............................................................................................18

*Jackson v. Metropolitan Edison Co.*,
  419 U.S. 345 (1974) ..............................................................................................18

*Kindt v. Santa Monica Rent Control Bd.*,
  67 F.3d 266 (9th Cir. 1995) ..................................................................................30

*Knight First Amendment Institute at Columbia University et al. v. Trump et al.*,
  928 F.3d 226 (2d Cir. 2019), cert. granted, judgment vacated sub nom 21, 22. 23

*Morgan v. Bevin*,
  298 F. Supp. 3d 1003 (E.D. Ky. 2018), 1-ER-28 ...............................................21

*Moulton v. Gjerde*
  (N.D. Cal., Sept. 16, 2020, No. 20-CV-02374-MMC) 2020 WL 5545285 ........22

*Phillips v. Ochoa*
  (D. Nev., Mar. 24, 2021, No. 220CV00272JADVCF) 2021 WL 1131693, at *3
  ................................................................................................................................25

*Public Utilities Comm'n v. Pollack*,
  343 U.S. 451 (1952) ..............................................................................................18

*Rosenfeld v. U.S.*,
  859 F.2d 717 (9th Cir. 1988) ................................................................................38

*United States v. Albertini*,
  472 U.S. 675 (1985) ....................................................................................... 31, 32

## TABLE OF AUTHORITIES CONTINUED

**PAGE**

**CASES**

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) .......................................................................... 2, 30, 32, 33

*West v. Atkins,*
   487 U.S. 42 (1988) ........................................................................................17

*West v. Shea*
   (C.D. Cal. 2020) 500 F.Supp.3d 1079 ................................................................24

*White v. City of Norwalk*
   (9th Cir. 1990) 900 F.2d 1421 ......................................................... 33, 34, 35

**STATUTES**

28 U.S.C.
§ 1291 .............................................................................................................7
§ 1294(1) ........................................................................................................7
§ 1331 .............................................................................................................7
§ 1343 .............................................................................................................7

31 U.S.C.
§ 3730 .............................................................................................................7

42 U.S.C.
§ 1983 ............................................................................................................26

California Government Code
§ 54952.6 .......................................................................................................20
§ 54952.2 .......................................................................................................27

**OTHER AUTHORITIES**

The Brown Act
§ 54950 et seq. ...............................................................................................27

# I.  INTRODUCTION

This is a First Amendment case testing whether two school-board members properly blocked Plaintiffs — husband and wife — from the school-board members' social media sites following Plaintiffs' barrage of harassing and spamming posts to the sites.  The case tests whether social-media sites, intended as personal campaign sites, became public for a for purposes of the First Amendment.  In part, the case tests whether the distinction between legislators and executives informs the analysis of state action.  Next, it tests whether an act of blocking access to the sites, which the District Court found to be appropriate because of the harassment and spamming, can transmute into a violation merely by the passage of time during litigation. Finally, there is an issue of whether cost and fees may be awarded against Defendant school-board members after the Court's finding that they enjoy qualified immunity.

The District Court correctly found that the social-media issues were novel and granted qualified immunity to the two school-board members.  The Court also correctly found that the members were justified in blocking the Plaintiffs from their social media sites because of harassing spamming of the sites.  But the Court erred by ruling that blocking was no longer narrowly tailored because of the passage of time during the litigation.  There was no evidence that there would be a change of behavior from the Plaintiffs in the event that they were unblocked.  Moreover, evidence of the long struggle and disputes between the Parties would predict that

Plaintiffs would immediately return to their misbehavior.  In other words, time alone cannot serve as substantial evidence to support unblocking, without evidence of a change in Plaintiffs' behavior.

Finally, after the blocking, the members discovered new tools from the social media platforms that permitted the use of word filters, essentially prohibiting anyone from posting on the sites.  The use of word filters should have mooted the case or removed the sites from public fora.

This Court should reverse the part of the decision that finds state action.  In the alternative, the Court should uphold the part of the decision that determined the blocking was narrowly tailored and a proper response to harassment, but reverse the part of the decision that found the narrowly tailored blocking decayed over time, and reverse the order for injunctive relief. Finally, the Court should rule that costs and attorney fees may not be awarded against immune defendants.

## II. ISSUES ON APPEAL

1) Did the trial court err by determining that Defendants' conduct constituted state action, particularly since Michelle O'Connor-Ratcliff and T.J. Zane were legislators who were running their social media platforms as campaign pages?

2) Did the trial court err by determining that Defendants' blocking of Plaintiff, which was initially held to be narrowly tailored, no longer became narrowly tailored due to the length of time of the blocking?

3) After the blocking, did the use of Defendants' use of word filters on their Facebook pages close the public forums?

4) Did the court clerk err in ordering costs to be paid by the Defendants, after they were found to be immune in this action?

## III.  JURISDICTIONAL STATEMENT

### A.    The District Court's Jurisdiction

The Garnier's complaint included claims pursuant to 42 U.S.C. § 1983 and 31 U.S.C. § 3730, over which the District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

### B.    The Ninth Circuit's Jurisdiction

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, and this Court is the proper court for this appeal pursuant to 28 U.S.C. § 1294(1).

## IV.  FACTUAL BACKGROUND

Plaintiffs, husband and wife, Christopher Garnier and Kimberly Garnier, sued the Defendants, Michelle O'Connor-Ratcliff (O'Connor-Ratcliff) and T.J. Zane (Zane), two elected school-board members, as well as the Poway Unified School District (District), under the First Amendment, pursuant to 42 U.S.C. section 1983, and the California Constitution, because the board members blocked the couple from posting on their social media accounts. 7-ER-1425, 1426, 1427, 1428, 1429. The

board members blocked Plaintiffs due to Plaintiffs' posting a large number of spamming and harassing posts over a very short duration of time. 7-ER- 32.

## A. Parties and Pages

Plaintiffs Christopher Garnier and Kimberly Garnier are parents of children who are students in PUSD. 7-RT-1570. Defendants Michelle O'Connor-Ratcliff and T.J. Zane are members of PUSD's Board of Trustees. 7-RT-1595, 1636. Both Defendants were first elected in 2014, and both still serve on PUSD's Board of Trustees. 7-RT-1597, 1636.

Zane has a Facebook account and maintains at least two pages.   7-RT-1595-98. He has a personal profile page that he uses for family and friends as well as a campaign page he uses for campaigning and issues related to PUSD. 7-RT-1596-97. Zane created the campaign page in 2014. 7-RT-1597. Zane is the only administrator of the campaign page. 7-RT-1597. Zane also has a Twitter account that he rarely uses but has interacted with Christopher Garnier on Twitter, which eventually led to an in-person meeting between the two. 7-RT-1621. Zane testified that Plaintiffs also posted on his personal and business Facebook pages, after which he blocked them from posting there. 7-RT-1620. Zane's decision to block Plaintiffs on his personal and business Facebook pages was not at issue at trial.

O'Connor-Ratcliff decided to run for the District's Board of Educators in 2014 and was initially sworn in to the District's Board of Education in November of

2014. 7-RT-1653. Like Zane, O'Connor-Ratcliff has a Facebook account. 7-RT-1636. She has both a personal page that she uses for family and friends as well as a public page she uses for campaigning and issues related to PUSD. 7-RT-1636. O'Connor-Ratcliff created her campaign page sometime before 2017. 7-RT-1636. Since 2017, O'Connor-Ratcliff has also used a Twitter account for campaign purposes. 7-RT-1667.

O'Connor-Ratcliff did not intend to use, and does not use, her social media accounts as feedback forums; rather, she uses her social media accounts as more of a bulletin board. 7-RT-1651. O'Connor-Ratcliff posts "campaign material" to her social media accounts. 7-RT-1651, 7-ER-741-42.

O'Connor-Ratcliff and Zane successfully created and published original social media content on Facebook and Twitter – known as posts and tweets, respectively and intended their Facebook and Twitter pages to be used in a "bulletin board" manner—providing one-way communication from themselves to their constituents. 7-RT-1613-14, 1616, 1630-31, 1651, 1657, 1668.

## B. PUSD Board Meetings in the Physical World

At public meetings of PUSD's Board of Trustees, members of the public can express their views to board members. 7-RT-1661. Public comments may be made on any topic of the speaker's choosing but do not allow for a response from members of the Board of Trustees. 7-RT-1504, 1662. Public comments are also limited to

three minutes per speaker. 7-RT-1661. There are several members of the public who appear at each meeting and often press the same points. 7-RT-1596. PUSD does not have a policy prohibiting members of the public from appearing at subsequent meetings and repeatedly addressing the same issues to the Board. 7-RT-1616. Both Defendants testified that they do not leave the room during the public comment time, even when the comments they are hearing are repetitive. 7-RT-1637.

## C. Other Alternate Avenues of Communication

Both Defendants receive public comment portions of Board meetings discussed above, and the public frequently uses in-person comments and their PUSD email addresses to contact them. 7-RT-1617, 1650. O'Connor-Ratcliff testified Plaintiffs emailed her PUSD email address 780 times. 7-RT-1656. Plaintiffs testified that email messages sent to Defendants went unanswered or the recipient refused to talk or meet. 7-RT-1504-05, 1572-73.

However, Defendants never attempted to prevent Plaintiffs from speaking during the public comment period of a Board meeting and never attempted to prevent Plaintiffs from sending emails to their PUSD email addresses. 7-RT-1656. Moreover, Zane has even met with Christopher Garnier in person on at least two occasions. 7-RT-1621.

///

///

**D. Plaintiffs' Interactions with Defendants' Pages and Accounts**

Christopher Garnier began posting on Defendants' Facebook pages when he believed they were not satisfactorily responding to his emails and other communications. 7-RT-1520. Plaintiffs acknowledged their posts were often repetitious. 7-RT-1524, 1583. On Facebook, Christopher Garnier made the same comment on forty-two posts made by O'Connor-Ratcliff. 7-RT-1663. On another occasion, Christopher Garnier posted the same reply to every tweet O'Connor-Ratcliff posted within approximately ten minutes. 7-RT-1659. This involved repeating the same reply 226 times. 7-RT-1659. On Facebook, Plaintiffs repeatedly posted the same or similar comments at high frequency during a short period of time. 7-RT-1551.

**E. Use of Word Filters**

In general, Facebook allows a page administrator to block a particular user from commenting on his page but does not allow a page administrator to entirely block comments from all other Facebook users. 7-RT-1598.

However, after this suit was filed, Facebook created a new feature that allows a page administrator to use word filters. 7-RT-1599-1600, 1614. Word filters are designed to allow a page administrator to moderate potentially offensive content on their page. 7-RT-1599-1600, 1614. If a page administrator adds a word to the filter,

a comment including that word will not appear as a comment on any post. 7-RT-1599-1600, 1614.

Zane began using word filters on his page in December 2018. 7-RT-117. Zane's use of word filters is to preclude all comments on his public page. 7-RT-117. To accomplish this intent, he added more than 2,000 words to his word filter. 7-RT-117. The words include words likely to appear in any comment, such as "he, she, it, [and] that," to ensure all comments are filtered out from his page. 7-RT-117. O'Connor-Ratcliff also adopted word filters to block all users from commenting on her Facebook campaign page. 7-RT-1643. Her intent, likewise, is to use her Facebook campaign page as a bulletin board to eliminate all comments. 7-RT-1651.

## F. Blocking

Christopher Garnier testified that in October 2017, he was blocked from posting on Zane's public Facebook page and remains so blocked today. 7-RT-1528, 1539. Zane denies this, stating he never blocked Christopher Garnier on his public Facebook page – only on his personal and business pages. 7-RT-1600. Zane also testified that he has deleted specific comments and used word filters, discussed above, attempting to prevent all Facebook users from commenting on his posts. 7-RT-1600. He stated that as Facebook's features have evolved, his use of the platform evolved as well. 7-RT-1614. He now tries to prevent any comments on his page by

using an extensive word filter instead of deleting individual comments. 7-RT-1600, 1614.

O'Connor-Ratcliff reported Plaintiffs' comments on her page to Facebook on two occasions. 7-RT-1658. A representative from Facebook informed O'Connor-Ratcliff that they were looking into the matter, but Facebook did not end up taking any action against Plaintiffs. 7-RT-1658. The representative also recommended O'Connor-Ratcliff block Plaintiffs on the platform, which she did. 7-RT-1658. O'Connor-Ratcliff has also blocked Christopher Garnier on Twitter. 7-RT-1676.

## G. Rationale for Blocking Was Due to Plaintiffs' Spamming

Zane's issue with Plaintiffs' posts on his social media page was the disruption and spamming nature of the comments, which went against Zane's intent to have the page be streamlined in a bulletin board nature. 7-RT-1616. Zane stated he never understood Christopher Garnier's decision to repeat comments beneath each post Zane made. 7-RT-1620. Zane testified that a comment repeated below each post "wasn't what I wanted for the page, so that's why I chose the settings that I did." 7-RT-1621.

Likewise, O'Connor-Ratcliff blocked Plaintiffs on her Facebook page and Christopher Garnier on Twitter due to the repetition, not content, of his posts. 7-RT-1663.

15

## V.  PROCEDURAL BACKGROUND

**A.      The Complaint Alleged Claims for Violations of the First Amendment by O'Connor-Ratcliff, Zane and the District**

The Complaint was filed on October 30, 2017. 7-ER-1425. The Complaint alleged violations of the First Amendment against Michelle O'Connor-Ratcliff, T.J. Zane, and the Poway Unified School District. 7-ER-1427, 1428, 1429.

The District filed a Motion to Dismiss pursuant to the Eleventh Amendment of the United States Constitution. 6-ER-1355, 1356. In response, Plaintiff' voluntarily dismissed the District on January 29, 2018. 6-ER,1306, 1307, 1308.

**B.      Defendants Filed a Motion for Summary Judgment that Was Granted in Part and Denied in Part**

Defendants filed a motion for summary judgment on February 15, 2019.  4-ER-697. The motion was decided on September 26, 2019. 2-ER-133. The Court granted the motion in part, finding the law in the area was new, so the two individual defendants are entitled to qualified immunity, but denied it in part, finding a triable issue of fact whether the two individual board members blocked the Plaintiffs because of the content of the messages. 2-ER-133, 141, 153, 154-156. Because of qualified immunity, the only remedy available was an injunction. 2-ER-156.

///

///

16

**C.    The Court Issued Judgment, and Defendants Timely Appealed**

The matter was set for trial on September 21, 2020. 7-RT-1484. At the conclusion of trial, the Court asked the Parties to address whether the fact that Defendants' actions were taken outside of a meeting could preclude those actions from being considered state action sufficient to allow a Section 1983 action to proceed. 7-RT-1682, 1692.

The Court issued a ruling on January 14, 2021. 1-ER-9. At trial the Court found the blocking was content neutral and initially narrowly tailored, but was no longer narrowly tailored due to the length of time that had elapsed. 1-ER-36-37.

**D.    The Court Clerk ordered Defendants to pay costs and denied Plaintiff's Motion for fees.**

The Court Clerk ordered costs to Plaintiffs on February 19, 2021. 1-ER-4-7. Defendants argued the case law directs that a determination of qualified immunity would bar any award of costs. 2-ER-46-52. However the Court clerk stated they did not have authority to deny costs for this reason, and denied Defendants' objection. 1-ER-4-7. The Court subsequently denied Plaintiffs' motion for attorney's fees due to the pending appeal. 1-ER-3.

## VI.    SUMMARY OF ARGUMENTS

Defendants are making the following arguments in favor of reversal:

1)      First, Defendants' blocking social media sites did not constitute state action. Defendants' social media pages were private campaign sites, Defendants were legislators with different authority than executives, and the campaign sites received no support from the District.

2)      While the Court correctly found that the members were justified in blocking the Plaintiffs from their social media sites because of harassing spamming of the sites, the Court erred by ruling that blocking was no longer narrowly tailored because of the passage of time during the litigation.  There was no evidence that there would be a change of behavior from the Plaintiffs in the event that they were unblocked.  Moreover, evidence of the long struggle and disputes between the Parties would predict that Plaintiffs would immediately return to their misbehavior. In other words, time alone cannot serve as substantial evidence to support unblocking, without evidence of a change in Plaintiffs' behavior.

3)      Defendants' use of word filters closed the public forum. Defendant's discovery and usage of new tools from the social media platforms that permitted the use of word filters, essentially prohibiting anyone from posting on the sites.  The use of word filters should have mooted the case or removed the sites from public fora.

4)      Finally, Defendants are immune from an award of costs and fees as school-board members whom the Court found are entitled to qualified immunity.

18

# VII.   ARGUMENTS

## A.   The Court Erred in Determining Defendants' Blocking Social Media Sites Constituted State Action

Plaintiffs base their federal claim on 42 United States Code, section 1983. Defendants' social media campaign pages were private sites, Defendants were legislators rather than executives, and Plaintiffs'

### 1.   A Section 1983 Action Requires "State Action"

To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988) ("*West*").   To constitute state action, "the deprivation must be caused by the exercise of some right or privilege created by the State ... or by a person for whom the State is responsible," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Ibid*. A public employee "acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West*, supra, at 49–50.

The right of free speech is protected only against infringement by governments. *Hudgens v. N. L. R. B.*, 424 U.S. 507 (1976) [relating to First Amendment rights; *Golden Gateway Center v. Golden Gateway Tenants Assn.*, 26

Cal.4th 1013 (Cal. 2001) [relating to California State Constitutional free speech rights]. "Civil rights, such as are guaranteed by the Constitution against State aggression, cannot be impaired by the wrongful acts of individuals, unsupported by State authority in the shape of laws, customs, or judicial or executive proceedings. The wrongful act of an individual…is simply a private wrong…" (*Civil Rights Cases*, 109 U.S. 3, 17 (1883).)

To determine whether there was state action or merely conduct on the part of an individual, "the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the [private person] so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974). A sufficiently close nexus may be found where there is high governmental regulation of an activity or where the government orders an activity. *Id*., at 356, analyzing *Public Utilities Comm'n v. Pollack*, 343 U.S. 451 (1952) [examining State action in First Amendment case].

///

///

///

### 2. Defendants Offered Three Reasons the Sites Were Private

In the motion for summary judgement both Defendants produced unrefuted evidence these sites were not official school district sites and did not qualify as "state action."

### a. The Sites Were Personal Campaign Sites

In the summary judgment, they produced evidence they each put up these sites without support, or the knowledge of the School District. 4-ER-736-739, 741-743. They put them up as campaign sites to support their candidacy for the office of school board member. 4-ER-738-739, 741-743.

These campaign sites are more properly analogized to campaign signs placed on lawns. Whether a campaign promotion sticks a sign in a lawn, tapes a sign to a light pole, or posted on a social media site, the campaign information is not posted pursuant to state law.

They testified that once they were elected, they continued to use the sites to promote their personal actions as school-board members as a part of their candidacy for the next upcoming term. 7-RT-116, 129, 130-131. From the moment they were elected they were running for the next term to continue their political career. They only used the sites to promote their activities and solicit support for their own benefit. They did not use their sites to promote the School District, except to the extent that action advanced their own careers. Ibid.

### b. A Legislator Has Different Authority than an Executive

Defendants also argued they held legislative offices rather than executive offices. An executive may act alone, officially, deciding an issue within the executive's authority without reference to any other person. But a legislator may only act at a properly convened meeting of the legislative body and may only offer a matter for consideration or vote on a matter. These two Defendants cannot take any official or legislative actions using their social media accounts. Instead, the five-member Board needs a majority vote to take any action on behalf of the School District. Cal. Gov. Code § 54952.6.

A legislator cannot act alone. Consequently, the legal analysis for an executive blocking a social media site must be different from the analysis of a legislator's social media site. A legislator may report a vote by the body, as a part of a campaign strategy, but that report is no different from a member of the public reporting a vote of the legislate body.

Their legislative office did not give them any individual authority, only authority to act at a properly noticed board meeting, so that their individual social media sites were not part of the School District and did not constitute official state action.

///

///

22

### c. The School District Did Not Support the Sites

The School District has its own media site and person to operate the School District site. 4-ER-736-737. The School District did not pay for, support, monitor, or even know about the Defendants' media sites. 4-ER-736-737.

On the motion for summary judgment the Court rejected the arguments that legislators are different from executives. At trial, Defendants raised that issue again, and the Court recognized a difference between this case and the *Knight* and *Morgan* cases, both of which involved an executive, because unlike the Defendants, legislators who have regular meetings at which the public can appear and provide comment, the executives in *Knight* and *Morgan* lacked such a forum. *Knight First Amendment Institute at Columbia University et al. v. Trump et al.*, ("*Trump*"), 928 F.3d 226, 233, (2d Cir. 2019), cert. granted, judgment vacated sub nom. *Biden v. Knight First Amendment Institute At Columbia University* (2021) 141 S.Ct. 1220], *Morgan v. Bevin*, 298 F. Supp. 3d 1003 (E.D. Ky. 2018), 1-ER-28. The trial court ultimately concluded that despite the distinctions between executives and legislators, the Defendants' actions of blocking the Plaintiffs was state action. 1-ER-28, 29.

### 3. Case Law Does Not Support the Finding of "State Action"

There are some cases that address the issue of blocking social medial sites. But none of the cases are binding, and none of the cases are on point.

One somewhat similar case is *German v. Eudaly*, No. 3:17-CV-2028-MO, 2018 WL 3212020 (D. Or. June 29, 2018). In *German*, the plaintiff brought a § 1983 claim against a City Commissioner for blocking her from the Commissioner's private Facebook page. *Id*. at *3. The court found that the plaintiff failed to allege state action when the only facts supporting that allegation were (1) the defendant was a city commissioner, (2) the defendant "discussed [plaintiff's] City Business" on the Facebook page, and (3) the Facebook page in question was a "non-official Facebook page" separate from the Commissioner's "official Facebook page to discuss City Business." *Id*. at *6. Those facts are similar to the facts in the case at bar.

In *Moulton v. Gjerde* (N.D. Cal., Sept. 16, 2020, No. 20-CV-02374-MMC) 2020 WL 5545285, the District Court dismissed a case against a Mendocino County Supervisor and, by operation of law, the County, for blocking a member of the public from a social media site. The court ruled in part that "a single supervisor, such as Gjerde, does not, as a matter of law, "'have final authority to establish the [c]ounty's official policy.' " *Id*. at *2. That ruling is consistent with the position taken by Defendants in this case.

Another somewhat similar case is *Knight First Amendment Institute at Columbia University et al. v. Trump et al.*, in which citizens sued President Trump for blocking them from his Twitter account. *Knight First Amendment Institute at Columbia University et al. v. Trump et al.*, ("*Trump*"), 928 F.3d 226, 233, (2d Cir.

2019), cert. granted, judgment vacated sub nom. *Biden v. Knight First Amendment Institute At Columbia University* (2021) 141 S.Ct. 1220.

The District Court found that the President and his aid's "control over the [Twitter] account is…governmental for three reasons: (1) the account is presented as being "registered to Donald J. Trump '45th President of the United States of America, Washington D.C.;'" (2) the tweets from the account are "official records that must be preserved under the Presidential Records Act;" and (3) the account has been used to conduct squarely executive functions." *Trump*, at 43-44. The Second Circuit affirmed the decision, but the Supreme Court granted certiorari, vacated the decision, and remanded with instructions to dismiss the case as moot. *Biden v. Knight First Amendment Institute At Columbia University* (2021) ("*Biden*") 141 S.Ct. 1220.

In a concurrence, Justice Thomas cautioned against applying old doctrines to new digital platforms and pointed out that Twitter had enough control over the social media account to remove Mr. Trump's account. Justice Thomas suggested a social media account was not truly controlled by the public official when the platform has the ultimate power. *Biden*, supra, at 1220-21.

That case differs from the case at bar, first, because that case involved the Executive, and these Defendants are legislators, and second, the sites are not supported in any way by the School District, the communications are not required to

25

be preserved by law, and sites are not used for an executive function, because these legislators do not have executive authority.

Another executive case involved a mayor how posted political positions on her Facebook page. *West v. Shea* (C.D. Cal. 2020) 500 F.Supp.3d 1079, 1082. While the posts were on a personal page, the content was partisan and consisted of political positions the Mayor intended to take. Unlike the case at bar, no one other than the Mayor could have taken those positions. An if an elected official puts campaign promises on a face book page, that is personal candidacy, because a legislator cannot take a position for a governmental entity like a Mayor can.

In *Davison v. Loudon County Board of Supervisors*, 267 F.Supp.3d 702 (E.D. VA 2017) ("*Davidson*"), a citizen sued an elected official for the violation of his free speech rights after the elected official blocked the citizen from her Facebook page. The Court considered several factors to determine whether there was state action, including: whether the public official categorized her social media page as that of a "Government Official;" whether the elected official invited the public to state-sanctioned events on her social media page; whether the government employer intertwined itself with the elected official's use of the social media page; and whether the blocked stemmed from official conduct by the elected official. *Id*., at 712-714. The Court answered all of the questions affirmatively. Notably, the Court found that the government employer used its resources to support the elected official's

Facebook page by paying the salary of one of the administrators of the social media page and the government employer's official newsletters included links promoting the social media page. *Id*., at 713.

This elected official was a legislator, but *Davidson* did not turn on that issue. The Fourth Circuit found the social media site used County resources to support the site and she used it as a tool of governance. None of those factors are present in this case. The School District did not even know about the Defendants' sites, did not support them, did not monitor them, and did not pay for them. The Defendants did not use the sites to promote School District events, but only their own political positions and careers.

In *Campbell v. Reisch*, 367 F.Supp.3d 987, (W.D. Mo. 2019) ("*Campbell*"), the court denied a motion to dismiss that argued there was no state action. That case was decided on a motion to dismiss, so the facts were sparce. But that case did not consider the difference in power between an executive and a member of a legislative body, nor address the issue of social media sites created as campaign sites. *Campbell*, supra, at 994.

In *Phillips v. Ochoa* (D. Nev., Mar. 24, 2021, No. 220CV00272JADVCF) 2021 WL 1131693, at *3 involved a judges' campaign page. The court dismiss the case saying, "Here, the only allegation that even approximates "official" conduct on Judge Ochoa's campaign page—namely, that the judge explained why he was

"reluctant to do jury trials in family court"—was clearly designed to further his re-election campaign." *Id*, at *3. In the case at bar, the Defendants similarly discuss their political positions.

In *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 295-96 (2001) ("*Brentwood*"), the Court analyzed whether an interscholastic athletic association's regulatory activity was "state action" for purposes of a 42 U.S.C. § 1983 claim. The Court set out three factors to determine whether there was state action present: (1) whether the private actor was acting pursuant to the state's coercive power, (2) whether the state provides "significant encouragement, either overt or covert," and (3) whether the private actor "operates as a willful participant in joint activity with the state or its agents." (*Brentwood*, at 296.) After analyzing these factors, the Court found that because public officials and public institutions were "pervasively entwined" in the association's compositions and workings, the association's regulatory activity was "state action." (*Id.*, at 298.)

Here, the Defendants' social media pages are not "governmental in nature." Nor are they entwined with the School District. The School District did not pay for the sites, set up the sites or maintain the sites. The sites were solely the responsibility of each of the Defendants, respectively.

While the social media pages may have stated the Defendants' position as Board members, that is simply a fact appropriate to a campaign site. Nothing in the

language of the sites made them look like official School District sites. The School District has its own employee to operate its social media sites and that person did not support or review the Defendants' sites. 4-ER-736-737.

Further, social media pages are not considered "official records" under California law. For example, the Ralph M. Brown Act ("Brown Act") (Cal. Gov. Code, § 54950 et seq.) does not require that the Defendants' posts be available to the public for review. In contrast, the Brown Act requires that communications between members of a legislative body regarding actions by that body be held during public meetings. See Cal. Gov. Code, § 54952.2.

Moreover, the elements provided by the *Brentwood* and *Davison* cases also show that the Defendants' blocking of the Plaintiff's was not "state action." The School District did not assert any "coercive power" over the Defendants when they created their social media pages, nor did the District "intertwine" itself with the Defendants' use of their pages. 4-ER-737-38. Indeed, the Defendants testified that they created their social media pages when they decided to run for office as a District Board member. 7-RT-1511, 1653-1654. Thus, they created their pages even before the state had any authority over them. Additionally, throughout their tenure as Board members, the School District has never asked the Defendants to post, or not post, any messages on their social media accounts. 4-ER-736-43. Instead, the Defendants

maintained their own pages and posted content to advance their individual political campaigns for the next election. 4-ER-738-43.

Lastly, although the School District also has several social media pages, these pages are administered by different people — the individual Defendants operate their social media pages and the District's Communication Department operates the Districts' social media pages. 4-ER-737-38. And the School District has a "District-Sponsored Social Media" policy, which states that each social media platform shall prominently display:

(3) A statement that the site is regularly monitored, and any inappropriate comments will be promptly removed. Inappropriate comments include those that: (a) Are obscene, libelous, or so incite students as to create a clear and present danger of the commission of unlawful acts, violation of school rules, or substantial disruption of the school's orderly operation; (b) Are not related to the stated purpose of the site, including, but not limited to, comments of a commercial nature, political activity, and comments that constitute discrimination or harassment. 6-ER-1302.

The Defendants have never posted the District's social media policy on their social media accounts and have never purported to act pursuant to that policy. 4-ER-736-43. Instead, the Defendants acted on their own volition when they blocked the Plaintiffs from their social media pages. 4-ER-736-43.

Despite Defendants clear and convincing testimony that they only intended for their social media pages to be bulletin boards and campaign pages, the court held that their actions constituted state action. 1-ER-28-29. Based on the analysis above, Plaintiffs cannot prove the "state action" element of their Section 1983.

**B.    The Court Erred in Finding Defendants' Blocking of Social Media Was No Longer Narrowly Tailored**

If the Court determines the Defendants operation of their campaign sites was "state action," then that raises the issue whether the social media sites were "limited public fora." The District court ruled the sites were limited public fora, and then correctly ruled the blocking of the Plaintiffs was justified by the harassing nature of the their repeated posting, but then erred in determining the blocking because less than narrowly tailored over time.

**1. The Blocking Was a Properly Tailored "Time, Place, or Manner" Restriction.**

The First Amendment permits time, place, and manner restrictions of public speech. *Cox v. New Hampshire*, 312 U.S. 569, 576 (1941); see also *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989) ("*Ward*"). To evaluate the constitutionality of government regulations of the time, place or manner of protected speech, the Supreme Court uses a three part test: the regulations must (1) be content-neutral, (2) be narrowly tailored to serve a significant government interest, and (3)

leave open ample alternative channels for communication of the information. *Ward,* supra, at 791; see also *Kindt v. Santa Monica Rent Control Bd.*, 67 F.3d 266, 271 (9th Cir. 1995) (finding rent control board's time restrictions on public commentary during meetings were "reasonable time, place, and manner restrictions that preserve a board's legitimate interest in conducting efficient, orderly meetings").

Regulations are "content-neutral" if they are "justified without reference to the content of the regulated speech." *Ward*, supra, 491 U.S. at 791. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.*

### a. Defendants' Blocking Was a Content- Neutral Rule of Decorum

Here the trial court properly held Defendants' blocking of Plaintiffs was a content neutral rule of decorum. Both Defendants testified that the content of the messages was not the reason for the act of blocking. 1-ER-30-33. They were both concerned with the number of posts, and the repeated, redundant posts. 1-ER-33.

Content neutral blocking of speech requires a Court to analyze whether the blocking constitute "reasonable restrictions on the time, place, or manner of protected speech" under the framework set forth by the Supreme Court in *Ward*, *supra*, 491 U.S. at 791. Regulations are "content-neutral" if they are "justified without reference to the content of the regulated speech." *Ward*, 491 U.S. at 791. "A regulation that serves purposes unrelated to the content of expression is deemed

neutral, even if it has an incidental effect on some speakers or messages but not others." *Id*. A regulation "need not be the least restrictive or least intrusive means" of serving a government's content-neutral interest, in order to be "narrowly tailored." *Id*. at 798. Instead, a regulation is "narrowly tailored" "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id*. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985).) The "ample alternative channels for communication" requirement is met when a regulation "does not attempt to ban any particular manner or type of expression at a given place or time." *Id*. at 802. Regulations that meet this requirement "continue[ ] to permit expressive activity." *Id*

The rationale for Defendant's blocking was clear. Plaintiffs posted repetitive posts accurately categorized as spam, and Defendants believable and repeatedly testified that the content of Plaintiffs' posts were not the reason for their blocking. 1-ER-30-33. The evidence failed to show that Plaintiffs were blocked due to the content of their comments, but instead was due to the repetitive spamming nature of the comments. 1-ER-33.

On Facebook, Christopher Garnier made the same comments on forty-two posts made by O'Connor-Ratcliff. 7-RT-1663. On another occasion, Christopher Garnier posted the same reply to very tweet of O'Connor-Ratcliff within

approximately a ten minute span. 7-RT-1659.  This involved repeating the same reply 226 times.. 7-RT-1659.

The trial court analyzed all of the evidence and determined that the evidence favored Defendants. 1-ER-31. The evidence "shows that Defendants' blocked Plaintiffs due to the repetitive manner off their posts, and the negative content of those posts. Accordingly, the Court concluded Defendants' blocking was content-neutral." 1-ER-33.

## 2.    The Court Held Defendants' Blocking of Plaintiffs Was Initially Narrowly Tailored

A regulation "need not be the least restrictive or least intrusive means" of serving a government's content- neutral interest, in order to be "narrowly tailored." *Ward*, supra at 798. Instead, a regulation is "narrowly tailored" "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id*. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985).) The "ample alternative channels for communication" requirement is met when a regulation "does not attempt to ban any particular manner or type of expression at a given place or time." *Ward*, supra at 802. Regulations that meet this requirement "continue[ ] to permit expressive activity." *Id.*

The Ninth Circuit has held that a city council may remove a person from a meeting without offending the First Amendment "when someone making a

proscribed remark is acting in a way that actually disturbs or impedes the meeting."
[*White v. City of Norwalk* (9th Cir. 1990) 900 F.2d 1421, 1424.]

The trial court found that "[o]n Facebook, Plaintiffs repeatedly posted the same or similar comments at high frequency during a short period of time. 1-RT-1551. The trial court ruled the "blocking promoted the legitimate interest of facilitating discussion on these social media pages and did not burden substantially more speech than necessary because it immediately responded to high frequency posting during a short period of time." *See Ward,* 491 U.S. at 799. 1-ER-35. Alternatively, applying the "unduly repetitious or largely irrelevant" threshold the Ninth Circuit articulated in *White,* Plaintiffs' comments surely also met this standard." 900 F.2d at 1426. 1-ER-35. For these reasons, the trial court held at the time Defendants blocked Plaintiffs, Plaintiffs' repetitive comments on Defendants' Facebook posts were narrowly tailored grounds for ejection from the forum. 1-ER-36.

The Court found the reasonableness of Defendants' blocking of Plaintiffs on Twitter to be even stronger. Christopher Garnier tweeted at O'Connor-Ratcliff repeatedly using the same reply 226 times in less than 10 minutes. 7-RT-1659. O'Connor-Ratcliff's blocking of Christopher Garnier was narrowly tailored because it constituted a very limited blocking induced only by an excessive "Tweet storm." 1-ER-36.

35

This matter differed from other social media cases, because those cases did not address repetitive posts. 1-ER-36. Additionally, the trial court applied *White's* "actual disruption" standard and held that Christopher Garnier's tweets once again crossed the line into "unduly repetitious or largely irrelevant." 900 F.2d at 1426. 1-ER-36. The Court correctly found that O'Connor-Ratcliff initially ejected Christopher Garnier from her Twitter forum for narrowly tailored reasons. 1-ER-36.

### 3. The Court Erred in Determining the Blocking Was No Longer Narrowly Tailored

Despite the Court's holding that Defendants' blocking of Plaintiffs was narrowly tailored, the Court then held that Defendants' blocking was no longer narrowly tailored at the time of trial. 1-ER-36.

The Court relied on the length of the blocking had persisted in order to reach the conclusion that it was no longer narrowly tailored. 1-ER-36-37. However that argument is flawed. Almost all of the passage of time between the act of blocking and the trial court's decision was taken up with litigation.  The blocking occurred sometime 2017.  1-RT-1627, 1637. The Plaintiffs quickly filed suit in October of 2017. 7-ER-1425-1430. All the rest of the time was taken up by a motion to dismiss, a motion for summary judgment, and some delay before trial because of Covid. Once the lawsuit was commenced, Defendants reasonably waited for a decision from the Court.

36

The lawsuit was filed on October 30, 2017. A. 7-ER-1425. decision from the Court was not reached until January 14, 2021. 1-ER-9. This is a period of 1,173 days which is over 3 years. The Court noted that "only the fact that the blocking has gone on for three years requires the Court to intervene here." 1-ER-37. This leads to the conclusion that at the time the lawsuit was filed, the blocking was permissible and narrowly tailored. Had there not been delays in trial dates beyond the control of Defendants, would the trial court have reached a conclusion about the blocking remaining narrowly tailored. Notably the Court did not decide at what point the blocking would go from narrowly tailored to no longer narrowly tailored. 1-ER-36-37. The area of social media is evolving and novel. The trial Court compared this matter to *White* and *Norse*, which involved actual city council meetings in the real world. 1-ER-36-37. The comparison is misguided and does not apply to this novel area of social media.

Furthermore, there was no evidence adduced at trial that the Plaintiffs would stop with the harassment and spamming in the event that they would be permitted to return to commenting on the board-member sites.  Without evidence that the Plaintiffs could behave themselves properly upon unblocking, there is no substantial evidence to support the Court's ruling that the blocking should cease.  Moreover, Defendants anticipate that if Plaintiffs are unblocked, their inappropriate online behavior will continue unabated, and then Plaintiffs will need to be blocked again.

n other words, without evidence of a change in behavior of the Plaintiffs that would indicate that they would no longer harass the board members, the passage of time alone cannot sustain the Court's determination.

## C.  Defendants Use of Word Filters Closed the Public Forum

Defendants testified they wished to utilize their social media pages as "bulletin boards" on which only they could post. 7-RT-1613-14, 1616, 1630, 1651, 1657, 1668.  They testified that they learned about new tools provided by Facebook and Twitter that permitted them to use "word filters" to eliminate any person from posting on their sites.  7-RT-1599-1600, 1602, 1614, 1619, 1643, 1645.  After they have blocked the Plaintiffs, Defendants discovered these tools and accomplished their original purpose of creating bulletin boards by using word filters extensively to block all comments. 7-RT-1619, 1644-1645, 1664, 1678.

It is undisputed that the government may close a designated public forum. *See DiLoreto v. Unified Sch. Dist. Bd. Of Educ.,* 196 F.3d 958, 970 (9th Cir. 1999) ("The government has an inherent right to control its property, which includes the right to close a previously open forum."). The Trial Court chose not to make a holding on this issue. While the waters may be uncharted, the use of word filters by Defendants to block all comments squarely place this matter within other similar cases where the government was permitted to close a designated public forum. The social media

pages have in effect been closed by Defendants' word filters. Therefore, Plaintiffs do not have standing, and the trial court erred in their ruling.

## D. Defendants Are Entitled To Qualified Immunity And Plaintiffs Are Not Entitled To Recover Damages Including Costs And Fees

In the motion for summary judgment the Court granted qualified immunity to these Defendants. 2-ER-156. At the beginning of trial, the Court informed the Parties that it would adopt the ruling on the motion for summary judgment. The Court formalized this ruling and found that Defendants are entitled to qualified immunity for Plaintiffs' damages claims. 1-ER- 11.

Plaintiffs sought attorney fees and costs from the Defendants. Per the Order Taxing Costs, costs were taxed in favor of Plaintiffs in the amount of $2,865.35. 1-ER-. The trial court denied the motion to retax costs, without prejudice. 1-ER-2. The trial court also denied the motion for attorney fees without prejudice. 1-ER-3

### 1. Appealability of the Orders on Costs and Fees

The Orders for fees and costs are not final orders, generally subject to appeal. But in this case, resolution of this issue in this cross appeal would expedite resolution of the case.

A "small class" of nonfinal orders are nevertheless appealable if they satisfy the requirements of the narrow "collateral order doctrine" of *Cohen v. Beneficial Indus. Loan Corp*., 337 U.S. 541, 546–47 , 69 S.Ct. 1221, 1225–1226, 93 L.Ed. 1528 (1949). The order sought to be appealed must:

1) conclusively determine the disputed question;

2) resolve an important issue completely separate from the merits of the action; and

3) be effectively unreviewable on appeal from a final judgment.

*Rosenfeld v. U.S.,* 859 F.2d 717, 720 (9th Cir. 1988)

This issue of fees and costs after the grant of qualified immunity meets this test. The Court is respectfully requested to resolve the issue of fees and costs in this cross appeal.

### 2. Defendants Are Immune From Costs

Case law makes clear that a determination of qualified immunity eliminates an award of costs or fees. Qualified immunity bars damages, including attorney fees and costs. *C.F. v. Capistrano Unified School Dist.* (C.D. Cal. 2009) 656 F.Supp.2d 1190, 1199, aff'd sub nom. *C.F. ex rel. Farnan v. Capistrano Unified School Dist.* (9th Cir. 2011) 654 F.3d 975. In that case, the court analyzed a similar issue and held that "the qualified immunity defense also bars claims for costs and attorneys' fees." *Ibid*.

In that matter, the Court granted part of the Defendants' Motion for Summary Judgment, ruling the Defendants were entitled to qualified immunity. Plaintiffs then sought attorney fees after they were granted an injunction. The Court held that qualified immunity protects defendants from liability for attorney fees as well as claims for costs. The Ninth Circuit approved the analysis. "Although Farnan sought

only nominal damages, the attorney's fees and costs for which Corbett could be liable absent the protection of qualified immunity undoubtedly would be considerable after more than three years of litigation." *C.F. ex rel. Farnan v. Capistrano Unified School Dist.* (9th Cir. 2011) 654 F.3d 975, 984.

The trial court in *C.F. v. Capistrano Unified School Dist.* relied on a similar case, out of the Eleventh Circuit, which also held that costs, expenses and attorneys' fees are barred by qualified immunity.

> A question has been presented in this appeal about whether the monetary damages which the defense of qualified immunity bars include plaintiffs' claims for costs, expenses of litigation, and attorneys' fees.7 The answer is "yes." We hold that, for qualified immunity purposes, the term "damages" includes costs, expenses of litigation, and attorneys' fees claimed by a plaintiff against a defendant in the defendant's personal or individual capacity.

*D'Aguanno v. Gallagher* (11th Cir. 1995) 50 F.3d 877, 881.

The court reached that conclusion based in part on an analysis of the purpose of qualified immunity.

> The policy that supports qualified immunity—especially removing for most public officials the fear of personal monetary liability — would be undercut greatly if government officers could be held liable in their personal capacity for a plaintiff's costs, litigation expenses, and attorneys' fees in cases where the applicable law was so unsettled that defendants, in their personal capacity, were protected from liability for other civil damages.

*D'Aguanno v. Gallagher*, supra, at 881.

The *D'Aguanno* Court also relied on legislative history and policy to reach its conclusion:

> Because section 1988, especially when read in the light of its legislative history, requires no award of costs, litigation expenses, or attorneys' fees from defendants in their personal capacity[8] and because the policy underlying qualified immunity would in no way be advanced by the award of such costs and fees against defendants in their personal capacity, we hold that such awards, even in actions for injunctive and declaratory relief, are barred when the defendant's conduct meets the objective good faith standard encompassed by the qualified immunity doctrine.

*Ibid.*

Because this Court held that Defendants Zane and O'Connor-Ratcliff are entitled to the defense of qualified immunity for damages, it follows that, under the controlling case law, Plaintiffs' are not entitled to recover any damages, which includes costs, expenses of litigation, and attorneys' fees claimed by Plaintiffs.

## VIII.  CONCLUSION

Defendants properly blocked the harassing posts by the Plaintiffs. Defendants' actions created private, personal campaign sites that should not be classified as state action. After the District Court concluded the sites were public fora, he correctly ruled the blocking was narrowly tailored and a proper time, place and manner restrictions, but then incorrectly ruled the narrowly tailored response somehow decayed as the time passed during litigation.  The blocking remains narrowly tailored despite the passage of time, since almost all the time passed because of delays in the litigation.

42

This Court should reverse the part of the decision that finds state action and dismiss the case. In the alternative, this Court should uphold the part of the decision that determined the blocking was narrowly tailored and a proper response to harassment but reverse the part of the decision that found the narrowly tailored blocking decayed over time, and reverse the order for injunctive relief.

Because the Court has determined the issue novel and the defendants were entitled to qualified immunity, the holding in *C.F. ex rel. Farnan* prohibits the award of costs. *C.F. ex rel. Farnan v. Capistrano Unified School Dist.* (9th Cir. 2011) 654 F.3d 975, 984. The Court is respectfully requested to deny Plaintiffs' award of costs.


Dated: July 23, 2021          ARTIANO SHINOFF

                                        By:   /s/  Jack M. Sleeth Jr.
                                              Jack M. Sleeth Jr., Esq.
                                              Attorneys for Appellant

## <u>CERTIFICATE OF WORD COUNT</u>

The text of this brief consists of 8,801 as counted by the Microsoft Word version 365 processing program used to generate the brief.

Dated:  July 23, 2021               By:  /s/  Jack M. Sleeth Jr.
                                         Jack M. Sleeth Jr., Esq.
                                         Attorneys for Appellant

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2021, I electronically filed the foregoing with the Clerk of the Court for the 9th District Court of Appeal, Division Two, by using the Court's TrueFiling system.

Participants in the case will be served by the Court's TrueFiling system.


Dated:  July 23, 2021       By:  /s/  Jack M. Sleeth Jr.
                                Jack M. Sleeth Jr., Esq.
                                Attorneys for Appellants